IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAH'AIR MONTANEZ-JOHNSON, **Plaintiff,** | CIVIL ACTION |
| v. | |
| CHESTER UPLAND SCHOOL DISTRICT, CORPORATION A, AND CORPORATION B, **Defendants.** | NO. 24CV4338 |

## OPINION

Plaintiff Jah'Air Montanez-Johnson was a junior at Chester High School in the Chester Upland School District (the "School District"), when he was stabbed in the arm by a classmate—an attack which left him disfigured and with permanent damage to his right arm.[1] He sued the School District,[2] asserting a claim under 42 U.S.C. § 1983 for violation of his substantive due process right to bodily integrity under the Fourteenth Amendment, as well as state law claims for negligence, breach of fiduciary duty, intentional infliction of emotional distress, and negligent infliction of emotional distress. The School District now moves to dismiss Montanez-Johnson's Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

### I. FACTUAL BACKGROUND

The facts as pled are straightforward: During a lunch period a fellow student used a metal

---

[1] Factual recitations are taken from Montanez-Johnson's Complaint, well-pleaded allegations from which are taken as true at this stage. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

[2] He also named as Defendants "Corporation A" and "Corporation B" (meant as stand-ins for the companies that operate and maintain the x-ray machines and metal detectors at the high school). But these fictitious names have not been substituted for the names of real entities as yet.

1

knife to stab Montanez-Johnson in the arm, causing permanent physical damage and disfigurement. He maintains that the attacker was able to bring the knife into school through the High School's metal detectors and x-ray machines which were malfunctioning that day. According to Montanez-Johnson, the School District knew of prior incidents in which students had attempted to bring weapons into the school, either knew or should have known that these security devices were not working properly, and, despite this, failed to fix the machines or take other precautions to prevent students from bringing weapons into school.

## II.   LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11.

## III.   DISCUSSION

### A.   § 1983 Claim: State-Created Danger

Montanez-Johnson's only federal claim arises under 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  Any viable § 1983 claim requires plausible allegations: (1) of "the violation of a right secured by the Constitution and laws of the United States;" and, (2) "that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

Here, Montanez-Johnson argues that the School District, a state actor, violated his Fourteenth Amendment substantive due process right to bodily autonomy by creating an opportunity for his attacker which otherwise would not have existed—a type of § 1983 liability dubbed the "state-created danger" theory.  *See Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170 (3d Cir. 2017).  To succeed on a state-created danger claim in the Third Circuit, a plaintiff must plead allegations satisfying four elements:

1) the harm ultimately caused [by the state actor's conduct] was foreseeable and fairly direct;
2) a state actor acted with a degree of culpability that shocks the conscience;
3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (quoting *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006)); *see Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996).  The School District argues that Montanez-Johnson's claim stumbles and falls, among other places, at the fourth element because the School District did not "affirmatively use[] [its] authority in a way that created a danger to [Montanez-Johnson]

3

or that rendered [him] more vulnerable to danger than had the [School District] not acted at all." *Id.*; *see also Bright*, 443 F.3d at 282 ("It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.").

The Third Circuit has recognized "the inherent difficulty in drawing a line between an affirmative act and a failure to act." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 242 (3d Cir. 2016). So, instead of analyzing this fourth element by determining whether the complained-of conduct was truly an 'act' or an 'omission'—an inquiry that can easily devolve into battles over "semantics," *Morrow v. Balaski*, 719 F.3d 160, 185-86 (3d Cir. 2013) (Ambro, J., concurring in part and dissenting in part)—the Third Circuit has developed an approach whereby a court will "first evaluate the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo." *L.R.*, 836 F.3d at 243. "This approach, which is not a new rule or concept but rather a way to think about how to determine whether this element has been satisfied," *id.*, helps to effectively "distinguish cases where government officials *might have done more* to protect a citizen from a risk of harm in contrast to cases where government officials *created* or *increased* the risk itself." *Morrow*, 719 F.3d at 186 (Ambro, J.) (emphases added).

With this framework in mind, the parties offer different characterizations of the status quo that should govern the analysis in this case. For the School District, the status quo is the period "[p]rior to the implementation of the x-ray machine and metal detector," during which time "students . . . would have been free to conceal a knife upon their persons or within their effects." For Montanez-Johnson, the status quo is the period of time after the implementation of the security devices, but before they broke down—in other words, a period during which a

4

student would have been frustrated in an attempt to bring a knife into school.

An examination of recent caselaw on this topic demonstrates that neither party's characterization is totally correct. In *L.R. v. School District of Philadelphia*, the Third Circuit considered a state-created danger claim brought by the parent of a kindergartner who was released from school into the custody of an adult who failed to identify herself to school staff and who thereafter sexually abused the child. 836 F.3d at 239. The Third Circuit determined that the relevant status quo was the moment before the kindergarten "teacher . . . permitted [the child] to leave"—which, in the environment of a "typical kindergarten classroom," was a time when the child was "closely supervised" and "safe from outside dangers." *Id.* at 243. Reasoning by analogy, the status quo in the instant case would be the moment before the School District allowed students to enter Chester High School through the broken security machines on the day in question—not the last time those machines worked (as Montanez-Johnson would have it), nor a time way back before they were first installed (as the School District argues).

With this temporal reference point in mind, the question becomes whether the School District's decision to let students enter school through the broken machines "resulted in a departure from that status quo," *L.R.*, 836 F.3d at 243, and thereby "created a danger" to Montanez-Johnson or "rendered [him] more vulnerable to danger than had the [School District] not acted at all." *Mann*, 872 F.3d at 170. To answer this question, it must first be determined whether and to what degree Montanez-Johnson faced a "danger" before entering school that day. In his pleadings, Montanez-Johnson calls attention to the "tragically and astonishingly high per capita murder rate" in Chester, which renders the city "as dangerous or more dangerous than any major city in the United States." The School District does not dispute this characterization of the latent danger facing all residents of Chester. Accordingly, for the sake of this analysis, it is

5

reasonable to conclude that Montanez-Johnson faced a significant "danger" before entering school on the day in question, simply by virtue of being a resident of Chester.

With the status quo determined—the moment before the School District let students enter Chester High School through the broken security machines—and the ex-ante risk of danger established—a significant risk—it must finally be "ask[ed] whether the [School District's] exercise of authority resulted in a departure from that status quo," *L.R.*, 836 F.3d at 243, in a manner that "created a danger" to Montanez-Johnson or "rendered [him] more vulnerable to danger than had the [School District] not acted at all," *Mann*, 872 F.3d at 170.  At the status quo ante—the moment before he was allowed into school that day—Montanez-Johnson faced a significant risk of danger.  Montanez-Johnson pleads no factual allegations to suggest that this risk of danger increased on account of the School District's decision to let him and the other students, including his attacker, into school.  In this sense, it cannot be said that the School District's conduct "resulted in a departure from that status quo," *L.R.*, 836 F.3d at 243.  Nor can it be said that the School District "created a danger" to Montanez-Johnson or "rendered [him] more vulnerable to danger than had the [School District] not acted at all," *Mann*, 872 F.3d at 170.

The Third Circuit's reasoning in *L.R.* supports this conclusion.  In that case, the Third Circuit explained that, by releasing the kindergartener to the unidentified adult without permission, the teacher worked a "drastic change to the classroom status quo" by "exposing [the student] to a danger she would not have otherwise encountered," thus satisfying the fourth element of the state-created danger analysis.  *Id.* at 243-44.  Put differently, *L.R.* is an example of a state actor "creat[ing] a danger" that the student would not otherwise have faced.  *Mann*, 872 F.3d at 170.

Usefully for present purposes, the Third Circuit also distinguished the facts of *L.R.* from a Supreme Court case foundational to the development of the state-created danger theory, *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the facts of which closely resemble the case at bar.  *Id.* at 243.  In *DeShaney*, an abused child sued social workers who, after removing him from the home of his abusive father and later returning him, failed to remove him a second time despite having received information suggesting that he remained in danger.  489 U.S. at 191.  The Supreme Court held that the child's Fourteenth Amendment rights were not violated because "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," absent some indication that the State either created the danger faced by the individual or did something to render the individual "more vulnerable" to it.  *Id.* at 197, 201.

In distinguishing *DeShaney* from *L.R.*, the Third Circuit explained that "the State's decision to leave [the child] with his father" in *DeShaney* was merely "a maintenance of the status quo" which neither created nor increased the risk of harm that the child faced.  *L.R.*, 836 F.3d at 243.  The same can be said in this case—Montanez-Johnson faced a significant risk of harm by virtue of living in Chester, and the School District simply maintained that status quo by allowing students to enter the school unscreened.  *Id.*  *See also Morrow*, 719 F.3d at 178 (finding that a school's failure to expel a violent bully, even when school policy required it, did not satisfy the affirmative act element); *L.R.*, 836 F.3d at 243-44 (characterizing the school's conduct in *Morrow* as a "maintenance of the status quo . . . insufficient to create liability").

Crucially, the fact "[t]hat the State once took temporary custody" of the boy in *DeShaney* did not "alter the analysis" for the Supreme Court, because when the State "returned him to his father's custody, it placed him in no worse position than that in which he would have been had it

not acted at all." *DeShaney*, 489 U.S. at 201; *L.R.*, 836 F.3d at 243 (quoting the same).  So too here; the fact that the security devices at Chester High School previously *did* work as intended "does not alter the analysis" because, when the School District let in students while the machines *did not* work, "it placed [Montanez-Johnson] in no worse position than that in which he would have been in" had he never entered the school at all.  *Id.*

The state-created danger theory gives succor to individuals who are exposed to harm by government conduct; it does not create a right of action in every case where the government "might have done more to protect a citizen from a risk of harm" the citizen already faced.  *Morrow*, 719 F.3d at 186 (Ambro, J.); *DeShaney*, 489 U.S. at 196 ("[The Fourteenth Amendment's] purpose was to protect the people from the State, not to ensure that the State protected them from each other.").  Because Montanez-Johnson has not pleaded allegations sufficient to suggest that the School District "affirmatively used [its] authority in a way that created a danger to [him] or that rendered [him] more vulnerable to danger than had [it] not acted at all," his state-created danger claim will be dismissed for failure to state a claim.

On a motion to dismiss, a complaint may be dismissed with prejudice (and a plaintiff denied leave to amend) if amendment would be inequitable or futile.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).  "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).  Here, Montanez-Johnson cannot plausibly plead additional facts to suggest that the School District created or increased a risk of harm to him.  Any version of his state-created danger claim will hinge on the facts that the School District: (1) was aware of Chester's high level of lethal violence; and, (2) did nothing to stop instruments of that violence from entering the school.  These facts, foundational though they are to his § 1983 claim, are the same

facts that put paid to that claim because they show that the School District's conduct did not "result[] in a departure from th[e] status quo" of Chester's already-dangerous environment. *L.R.*, 836 F.3d at 243. For this reason, any attempt to distill a state-created danger claim from the facts of this case "would fail to state a claim upon which relief could be granted," making amendment futile. *Fauver*, 213 F.3d at 115. Because amendment would be futile, the dismissal will be with prejudice.

### B. State Law Claims

In addition to his federal § 1983 claim, Montanez-Johnson brings Pennsylvania state law claims against Defendants for negligence, breach of fiduciary duty, intentional infliction of emotional distress, and negligent infliction of emotional distress. The federal supplemental jurisdiction statute grants jurisdiction over these claims because "they form part of the same case or controversy" implicated by the § 1983 claim, 28 U.S.C. § 1367(a), over which claim the court has original "federal question" jurisdiction pursuant to 28 U.S.C. § 1331.

However, the supplemental jurisdiction statute also provides that a district court "may decline to exercise supplemental jurisdiction over a [state law] claim if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). Moreover, the Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (citing *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)) (emphasis added).

Here, Montanez-Johnson brings only one claim falling within the Court's original

9

jurisdiction—his § 1983 claim—which, as explained above, will be dismissed with prejudice. Neither party identifies anything unique or exceptional about this case such that "the considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification" for exercising supplemental jurisdiction over Montanez-Johnson's state law claims. *Id.* Accordingly, the Court will exercise its discretion to "decline . . . supplemental jurisdiction" over those claims, 28 U.S.C. § 1367(c)(3), and will dismiss them without prejudice to Montanez-Johnson's right to raise them in state court.

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*
_____
**WENDY BEETLESTONE, J.**